IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| KIRK R. MOLDER,<br><br>        Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>        Respondents. | CV 13-59-GF-DWM-JTJ<br><br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

On August 19, 2013, Petitioner Kirk R. Molder filed an application for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) David Ness was subsequently appointed to represent Molder. (Doc. 8.) An Amended Petition was filed on December 8, 2014. (Doc. 17.)

The State filed an Answer to the Amended Petition on March 6, 2015. Following briefing relating to the State's statute of limitations defense (Docs. 27-31, 34-38, 40-41), Molder filed a Reply to the State's Answer. (Doc. 45.) This matter is ready for adjudication.

## I.     Background

Molder was in a relationship with a woman named Shannon Berg for approximately nine years. Berg had two children, Savannah and Brittany

Highland, from a previous relationship. Molder and Berg had a son together, Kirk Junior. Berg abandoned the family, and Molder raised the children on his own. Molder moved to Montana from Oregon in June of 1998. (Doc. 23-52 at 72.)

Mr. Molder primarily worked as a motel manager across Montana. In 1998, he began working at the Highwood Village, a motel in Great Falls. In April 1999, a fourteen year-old girl named Shauna Terry became acquainted with the family. Shauna's mother also worked at the Highwood Village. Shauna immediately became friendly with the family, often acting as a babysitter or caretaker for the children.

In 1999, Mr. Molder moved his family to Forsyth, Montana, and began managing a motel there. On September 22, 1999, following an allegation of educational neglect, the three children were removed from Molder's care and placed in foster care. On October 29, 1999, Brittany and Savannah saw Dr. Patricia Pezzarossi at the Holy Rosary Health Center in Miles City, Montana, and underwent anal-genital exams. (Doc. 23-52 at 25.) Brittany was nine years old, and Savannah was eleven.

Brittany's exam was normal and her hymen was intact. *Id*. At Savannah's initial appointment she refused to allow Dr. Pezzarossi to complete the examination and informed the doctor she did not want the doctor to make a record or write anything down for fear that Molder would find out what she had said. *Id*.

On November 11, 1999, a subsequent examination was performed while Savannah was placed under anesthesia. (Doc. 23-52 at 27.) That exam revealed normal findings, with no evidence of recent or remote trauma and an intact hymen. *Id*.

Molder moved back to the Highwood Village in Great Falls and within several months the children were returned to his care. Around this time, Shauna Terry made a complaint against Molder to a Great Falls Police Detective. She claimed the two had been involved in an ongoing sexual relationship. Terry later recanted and claimed that this accusation was made at the urging of her mother as a means to get "revenge" against Molder. (Doc. 23-52 at 18.) No charges were filed against Molder in 2000 as a result of Terry's accusation.

The Molder family moved into the Countryside Village, a trailer park in Great Falls. At the beginning of 2001, the family moved to Miles City where Molder went to work at the Custer Inn. In the spring of 2001, the family returned to Great Falls and resided yet again at the Highwood Motel until a renter could vacate Molder's trailer at the Countryside Village.

In June 2001, an anonymous referral was made to the Department of Health and Human Services reporting that Savannah had disclosed abuse to the caller; specifically, Savannah said that Molder "makes me sleep with him and sometimes hurts me." (Doc. 23-52 at 5.) On June 13, 2001, the children were placed in protective custody by the Department. *Id*. at 10. Initially, the children were placed

with Molder's parents, but they were moved into foster care.

On June 19, 2001, Dr. Nora Gerrity performed full examinations on both girls. It was determined that Savannah had a "complete[ transection of her hymen] at 7 o' clock (Doc. 23-52 at 7), and that Brittany had a "post-traumatic cleft in the hymen at 5 o'clock." *Id*. at 8. Thus, the findings relating to both girls were consistent with sexual abuse.

Youth in Need of Care Proceedings were initiated. Junior was returned to Molder's care on July 18, 2001, and dismissed from the matter, while the girls remained in protective custody. (Doc. 23-52 at 67.) At a hearing held before Judge McKittrick in Great Falls, Molder asserted that he was common law married to Shannon Berg and asked to be allowed to participate in the Youth in Need of Care proceedings related to Savannah and Brittany. (Doc. 23-24 at 4.) Apparently, Judge McKittrick made an initial finding that a common law marriage existed and allowed Molder to participate in the proceedings. *Id*.

In December 2001, Molder was ordered to have no contact with the girls. (Doc. 23-52 at 67.) On March 3, 2002, Molder took the girls from their protective placement and fled to Canada with them. *Id*. Molder was arrested in Oroville, Washington, in April 2002. *Id*. at 68. The girls were placed in foster care in Washington and returned to care in Montana. When Molder fled with the girls, he abandoned Junior, who was taken back into protective custody in March 2001. *Id*.

at 71.

Molder was charged on April 29, 2002, with custodial interference and ultimately pleaded guilty to two counts. (Doc. 23-12 at 4.)  Following a hearing held on November 6, 2002, and despite his prior finding that a common law marriage existed, Judge McKittrick held that Molder did not have a legal relationship to the girls for purposes of the Youth in Need of Care action and determined that he was, therefore, not an interested party.  (Doc. 23-52 at 88.)

Brittany was placed in a residential treatment program in Dillon on July 29, 2002.  Sometime following this placement, yet prior to September 30, 2002, Brittany apparently disclosed to her therapist that she was sexually abused by Mr. Molder.  Invest. Req. (Doc. 23-52 at 94).  Savannah was placed in a residential treatment program in Helena on August 7, 2002.  Sometime following this placement, Savannah also apparently reported sexual abuse by Molder.  *Id.* Sometime prior to August 30, 2002, Junior told his counselor that he had had sex with Shauna at his sisters' direction and that he believed his sisters to be lesbians. (Doc. 23-52 at 91.)

On February 12, 2003, Brittany was interviewed by Detective Shaffer.  Aff. To File Info. (Doc. 23-3 at 2).  Brittany reported that the sexual abuse began when she was eight years old and living with Molder at the Highwood Village Motel.  *Id.* at 2-3.  Brittany reported that the abuse continued until she was 11 and living at the

Countryside Village in Great Falls. *Id*. at 3. Brittany acknowledged denying the abuse in previous interviews because she was afraid she would get in trouble. *Id*.

Savannah was also interviewed but maintained the only time she had sexual contact with Molder was when they were in Edmonton, Canada. *Id*. Savannah expressed fear of Molder. *Id*. Molder was initially charged for offenses alleged to have been committed against Brittany, specifically: Sexual Intercourse without Consent (Count I); Incest (Count II); Sexual Intercourse Without Consent (Count III); Incest (Count IV); Sexual Intercourse Without Consent (Count V); and Incest (Count VI). Info. (Doc. 23-4). Molder was arraigned on the charges July 10, 2003. (Doc. 23-5.) The jury trial was originally set for October 20, 2003. *Id*. at 6. That trial date was continued at the request of defense counsel because the defense had not yet received a report from an expert witness. (Doc. 23-6 at 3.)

The defense subsequently filed a motion to dismiss and a hearing was set. Apparently, while Savannah was in Great Falls to provide testimony at the hearing, she disclosed that Molder had abused her when they lived in Great Falls. *See* Aff. Amd. Info. (Doc. 23-12 at 4). Savannah disclosed the sexual abuse occurred over a two-year period. *Id*. She stated that she did not disclose the abuse initially because she felt sorry for Molder and did not want him to go to jail. *Id*. Savannah detailed the abuse and indicated that it occurred at the Highwood Village Motel and while she, Brittany, and Molder were in Canada. *Id*. at 4-5. Savannah also

disclosed she was aware that Molder had had sex with Shauna Terry when Terry was fifteen. *Id.* at 5.

On March 23, 2004, Shauna was interviewed and explained that she met Molder when she was 14 years old. *Id.* She indicated they began a sexual relationship at the Highwood Village Motel and that they had sex multiple times each week until June 1999. *Id.* at 5-6.

An Amended Information was then filed to include charges against Molder for his abuse of Savannah: Sexual Intercourse without Consent (Count VII), Incest (Count VIII); and Shauna: Sexual Intercourse without Consent (Count IX). Am. Info. (Doc. 23-14 at 3-4.)

## II.    Procedural History

On November 8, 2004, Molder proceeded to trial with his third appointed attorney, Steven Hudspeth. Prior to the start of the trial a hearing was held to address complaints that Molder had made in relation to Hudspeth's representation. *See generally* (Doc. 23-22 at 6-43). Ultimately, Molder did not request new counsel, but rather requested that the trial be continued so he and Hudspeth could have more time to prepare. *Id.* at 39. Hudspeth informed the Court that he was prepared for trial and no additional time was necessary. *Id.* at 40. The Court denied Molder's request for a continuance. *Id.* at 42-43. Molder was convicted of all nine felonies and was sentenced to serve a seventy-five year prison sentence on

each count, with all terms running concurrently.

## A. Direct Appeal

Molder timely filed a direct appeal. *State v. Molder*, 152 P.3d 772 (Mont. 2007). He alleged that: (1) the trial court should have granted his request for a continuance when he presented unrefuted complaints that his attorney was unprepared for trial, *Id*. at ¶ 20; and (2) the trial court erred by holding defense counsel's failure to meet with Molder until the night before trial, failure to contact Molder's defense witnesses, failure to interview any of the State's witnesses, and failure to follow-up on Molder's motion to dismiss did not amount to substantial complaints. *Id*. at ¶ 29.

As to the first issue, the Montana Supreme Court observed that Hudspeth did refute Molder's claims that he was unprepared for trial. *Id*. at ¶ 22. Further, the Court observed that the decision of whether to vacate a trial is left to the discretion of the trial court. *Id*. at ¶ 23. The Court observed Hudspeth was appointed to represent Molder more than five months before trial and that he made the deliberate and strategic decision not to interview some of the witnesses. *Id*. at ¶ 24. Hudspeth advised the trial court he was prepared to proceed. The Court found a review of the record supported this assertion: Hudspeth explored inconsistencies in the victims' statements, prepared defense theories, and utilized the letter he received from Molder the day before trial. *Id*. Further, Hudspeth explained his

strategy was not to personally interview the victims so as better to impeach them. *Id*. at ¶ 26.  The record reflected that this was a strategy he pursued.  As to another witness Molder claimed Hudspeth failed to interview, "Hudspeth chose not to present a defense based on a claim that the victims had been coerced, but, rather, adopted a strategy of impeaching their testimony based on their inconsistent statements."  *Id*.  In short, the Court could not determine that Hudspeth's strategy was unreasonable.  *Id*.

As to the motion to dismiss, the Court observed that the motion had little chance of success and that two of the State's witnesses testified that the victims initially denied any sexual contact with Molder.  *Id*. at ¶ 27.  Molder suffered no prejudice, and his substantial rights were not affected by Hudspeth's failure to pursue the motion to dismiss.  *Id*.  The trial court did not abuse its discretion by refusing to grant Molder's request for a continuance.  *Id*. at ¶ 28.

Additionally, Molder's argument that he had presented a substantial complaint against Hudspeth and was, thus, entitled to a separate hearing to determine if counsel needed to be replaced was unavailing.  The Court determined that a separate hearing was not necessary for the trial court to determine whether to grant a continuance.  *Id*. at ¶ 33. There was no indication that Molder and counsel had a conflict so great that it resulted in a total lack of communication.  Because new counsel was not requested, no such hearing was necessary.  *Id*.

## B. Postconviction Proceedings

Molder then filed a pro se petition for postconviction relief and affidavit in support.[1]  (Docs. 23-43; 23-44.)  The trial court ordered that counsel be appointed to represent Molder in the proceedings.  (Doc. 23-50.)  Attorney Colin Stephens filed an Amended Petition for Postconviction Relief on Molder's behalf wherein he advanced eleven grounds for relief:

1. Trial counsel was ineffective for failing to offer into evidence the medical records of Brittany and Savannah's 1999 examination in Miles City and failing to use the records to impeach Brittany, Savannah, and the State's experts.

2. Trial counsel was ineffective for failing to introduce Savannah's voluntary statement that she had sex with two boys prior to the 2001 examination by Dr. Gerrity.

3. Trial counsel was ineffective for failing to address Shauna's potential motive to fabricate her allegations in light of Junior's disclosure relating to Shauna sexually abusing him and her relationship and influence over Brittany and Savannah.

4. Trial counsel was ineffective for failing to properly address the legal relationship between Molder and Savannah and Brittany thereby allowing the State to pursue incest charges against Molder.

5. Trial counsel was ineffective in failing to seek a specific unanimity instruction pursuant to *State v. Weaver*, 964 P.2d 713 (Mont. 1998).

---

[1]  Molder also sought sentence review.  That issue is not pertinent to the discussion here but was previously addressed by the parties and the Court.  (Docs. 27-31, 34-38, 40-41.)

6. Trial counsel was ineffective for failing to object to the prosecution's definition of "reasonable doubt" or ask for a curative instruction.

7. Trial counsel was ineffective for failing to challenge one juror for cause and for failing to inquire into another juror's personal knowledge of the case.

8. Trial counsel was ineffective in failing to properly challenge Detective Slavic's opinion testimony that Savannah and Brittany were "coached" to deny abuse.

9. Trial counsel was ineffective in failing to properly challenge the testimony of Dr. Maynard which the State introduced to bolster Savannah and Brittany's allegations.

10. Counsel's deficient performance constituted cumulative error, thus undermining confidence in the entire trial process.

11. Appellate counsel was ineffective for failing to raise any of the above record-based claims on appeal.

(Doc. 23-46 at 2-4.)[2]  The State responded to the petition, and Molder filed a reply.

(Docs. 23-48; 23-49.)  On October 5, 2011, a hearing was held before District

Court Judge Macek.  (Doc. 23-51).  Kirk Molder was the only witness to testify at

the hearing.[3]

At the conclusion of the testimony, the court ruled from the bench on several

issues.  Only one of Judge Macek's oral pronouncements is pertinent to Molder's

federal habeas action.  The trial court held that the issue of the legal relationship

---

[2] Claims 1-5 and Claim 10 are the basis of Molder's present 28 U.S.C. § 2254 petition.

[3] Molder's trial attorney, Steven Hudspeth, passed away prior to the initiation of the postconviction proceedings.

between Molder and Savannah and Brittany was resolved at trial via a stipulation to which Mr. Molder agreed. *Id*. at 120. The court noted that the issue of whether there is a legal relationship between parties in a Youth in Need of Care proceeding, which would permit a birth parent to participate in the proceeding, differs from the question of whether or not there is a legal relationship for purposes of charging an individual under the criminal statute for incest. *Id*. Molder failed to meet his burden of proving that trial counsel was ineffective, and even if trial counsel were ineffective, the evidence would not have resulted in a different outcome. *Id*.

The trial court took the remaining issues under advisement and subsequently issued a detailed written order addressing each issue. (Doc. 23-54.)

i.     **Miles City Medical Records**

The trial court determined that Molder failed to show that trial counsel's failure to introduce the Miles City records or call the Miles City doctors fell below an objective standard of reasonableness. The court began by noting that Molder did not provide the records to Hudspeth until the night before trial, but that Hudspeth and Molder did discuss the use of the records and the potential detriment of their admission. (Doc. 23-54 at 16.) The court went on to note that the probative value of the records only pertained to Brittany and the allegations related to her, specifically those alleging abuse prior to October 1999; there was no corresponding allegation made in this time period relating to either Savannah or

Shauna. *Id*. at 17. If the doctors testified consistently with the reports, they would state that there were no physical findings of abuse. The trial court observed, however, that the State's experts at trial testified that a lack of physical findings does not mean that physical abuse has not occurred, particularly in prepubescent girls. *Id*. at 17-18.

The court went on to outline the ways in which the introduction of the medical records or testimony related to them could be detrimental to Molder. Introduction of the records would have underscored the fact that the girls were removed from Molder years prior to the initiation of the removal proceedings and subsequent criminal charges in Great Falls. *Id*. at 18. Also, despite Molder's contention that the children were only removed for "educational neglect," an invasive anal-genital exam performed on each tended to undermine this assertion and would lead the jury to infer there were prior suspicions of sexual abuse. *Id*. The report contained language particularly detrimental to Molder in reference to Savannah's exam:

> She did not want me to make a record of anything or write anything down that she said as she feared her stepfather would find out what she was saying. Although she denied any sexual abuse, she refused to let me examine her vaginal area . . . . Due to the circumstances surrounding these children and [Savannah's] attitude and disclosures in my office, I do feel strongly to recommend an examination for her. I also feel that [Savannah] needs quite a bit of counseling and this was also recommended.

*Id*. at 18.

The court began its analysis by noting that Hudspeth was a skilled trial attorney who had handled many cases involving sexual abuse of children and was, accordingly, acutely aware of the danger these records presented. Hudspeth used the records to "vigorously" cross examine Dr. Gerrity regarding her findings. *Id*. at 19. In closing argument, Hudspeth actually explained his trial strategy as it related to the use of the records. *Id*. at 19-20.

Thus, the court found that Hudspeth's use of the records was objectively reasonable. He was able to obtain an admission from Savannah that she had had a prior anal-genital examination, the inference being that there was no finding indicative of abuse because the girls were ultimately returned to Molder after this removal. *Id*. at 20. He was also able to use the records to cross examine Dr. Gerrity without having to introduce the actual records and the corresponding harmful information contained therein. *Id*. The court observed that the use of the records in this manner was a deliberate trial tactic and strategy.

The court held that even if Molder were able to meet the first prong of *Strickland*, in light of the ample direct evidence regarding the charges involving Brittany, Molder was unable to demonstrate the existence of a reasonable probability that the result of the proceeding would have been different absent trial counsel's error. The claim was denied. *Id*. at 21-22.

ii.    **Rape Shield Evidence**

The trial court found that both of the pieces of evidence that Molder sought

to introduce—Savannah's assertions that she had sex with two others prior to her

exam by Dr. Gerrity and Savannah's motive to fabricate her allegations against

Molder—would both have been excluded under Montana's rape shield statute, and

therefore, Hudspeth was not ineffective for failing to seek their introduction.

The court began by outlining Montana's rape shield law, contained at

Montana Code Annotated § 45-5-511(2):

> No evidence concerning the sexual conduct of the victim is admissible
> in prosecutions under this part except evidence of the victim's past
> sexual conduct with the offender or evidence of specific instances of
> the victim's sexual activity to show the origin of semen, pregnancy, or
> disease which is at issue in the prosecution.

The court noted that neither exception outlined was at play in relation to the

proffered evidence; the evidence did not involve Molder as a participant, nor was it

intended to show the origin of semen, pregnancy, or disease.  *Id*. at 25-26.  The

narrow exception recognized by the Montana Supreme Court was also not at issue;

that is, the proffered evidence did not relate to the victim's prior assertion of sexual

abuse that later were proven to be false and the evidence was not "narrowed to the

issue of the complaining witness' veracity."  *Id*. at 26.

Molder theorized that Savannah's 2003 statement that she had sex with one

or two other individuals was crucial to explain the nature of the injuries observed

by Dr. Gerrity in her 2001 examination. The court observed that at the time of the interview, Savannah was denying that Molder had abused her in Great Falls and she maintained that denial for another year. *Id*. at 27. The court noted that "under the unique factual circumstances of this case, where [Savannah] repeatedly attempted to cover for Molder and repeatedly denied that he had sexually molested her until she just couldn't take it anymore, the Court finds that this evidence itself as presented is speculative in light of the fact that this may well have been one more attempt to divert attention from allegations against Molder." *Id*. The court did not fault Hudspeth for failing to seek to introduce this evidence, finding that he reasonably concluded that the proffered evidence would not fall within an exception to the rape shield statute, and that Molder's confrontation rights were not violated. Molder failed to show that Hudspeth's performance fell below an objective standard of reasonableness. *Id*.

Additionally, Molder failed to meet his burden relative to the assertion that Savannah, and by extension Shauna and Brittany, had motive to fabricate stories based on Junior's disclosure to his counselor that his sisters had directed him to have sex with Shauna and that he believed Savannah and Brittany were lesbians. The court noted that this statement came from an excerpt of a counselor's report contained in the guardian ad litem's report in a youth in need of care proceeding, thus constituting an unsworn double hearsay statement. *Id*. at 28. The record did

not reveal that any of these events actually occurred or that any of the girls had knowledge that Junior even made this statement. *Id*. at 25, 28. Hudspeth's failure to attempt to introduce the double hearsay statement did not fall below an objective standard of reasonableness, and the claim was denied. *Id*. at 28.

### iii.  **Unanimity Instruction**

The trial court observed that this issue was record based and, therefore, Molder was procedurally barred from claiming that his trial counsel was ineffective for failing to request a unanimity instruction in postconviction. The court stated the only question properly before it was whether appellate counsel was ineffective for failing to raise the issue on direct appeal. *Id*. at 30. Regardless, the court considered the merits of the claim and found Hudspeth was not required to ask for the instruction, the Court was not required to give the instruction, and appellate counsel did not err by failing to raise the claim on appeal. *Id*. at 33-34.

While the court did not dispute that the right to a unanimous jury verdict is fundamental, it distinguished the type of jury instruction required by *Weaver* from a case involving an ongoing and continuous course of conduct such as that involved in Molder's case. *Id*. at 31-33. Thus, the allegations lodged against Molder fell within an exception, and a *Weaver* unanimity instruction was not required. *Id*. at 33. The court went on to note that each count alleged in the information referred to one victim and the verdict form specifically set out the

name of each victim, the timeframe within which the act was alleged to have occurred, and the specific offense alleged in each count; thus, there was no potential for jury confusion as to which count pertained to which victim during a given time period. *Id.* Additionally, the court noted that there was only one act alleged to have occurred with each victim: sexual intercourse without consent via penile penetration. Unlike in *Weaver*, where separate acts of sexual contact were alleged against separate victims, there was testimony from each victim that Molder engaged in sexual intercourse with that victim. *Id.*

For this reason, the court held that Hudspeth was not required to request a unanimity instruction and that even if the claim were not barred Hudspeth's performance was not deficient. *Id.* at 33. Accordingly, appellate counsel did not err by failing to present this claim on direct review. Molder failed to show the performance demonstrated by trial or appellate counsel fell below an objective standard of reasonableness, and the claim was denied.

### iv.  Cumulative Error

Because the court found that Hudspeth's performance was not deficient, the court held that Molder failed to meet his burden and denied the claim of cumulative trial error. *Id.* at 34.

### C. Postconviction Appeal

Molder filed a direct appeal from the denial of his postconviction petition.

In a noncitable memorandum opinion, the Montana Supreme Court summarily affirmed the trial court's denial of postconviction relief. *Molder v. State*, 311 P.3d 442 (Table) (Mont. 2013).

The Court agreed with the trial court's finding that it was sound trial strategy for Hudspeth not to offer the Miles City records into evidence, observing that the records had "little exculpatory value" while having the potential to be "problematic." *Id*. at ¶ 7. Therefore, Hudspeth's use of the records during cross-examination and closing argument, and decision not to admit them into evidence, was reasonable. The Montana Supreme Court also agreed with the trial court's finding that Hudspeth was not ineffective for refusing to introduce the information relating to the girls' prior sexual conduct, whether to impeach them or show an alternative explanation for Savannah's medical findings. The Court agreed that the information was inadmissible under Montana Code Annotated § 45-5-511(2). *Id*. at ¶ 8. The Montana Supreme Court likewise agreed with the trial court's findings relative to Hudspeth's failure to request a unanimity instruction. *Id*. at ¶ 9. The Court determined that all of Molder's claims lacked merit. Molder failed to establish that Hudspeth rendered deficient performance or that he had suffered prejudice as a result of Hudspeth's performance. *Id*. at ¶ 11.

## III.    Molder's Claims

In his present petition, Molder raises the following issues:

Claim 1: Ineffective Assistance of Trial Counsel for failing to introduce evidence relating to Brittany's 1999 anal-genital examination in Miles City (Doc. 17 at 29-33);

Claim 2: Ineffective Assistance of Trial Counsel for failing to introduce Savannah's statement that she had sex with two boys prior to being examined by Dr. Gerrity in 2001 to rebut the State's expert witness testimony that her vaginal examination supported the allegation of sexual abuse, *id*. at 33-36;

Claim 3: Ineffective Assistance of Trial Counsel to request a specific unanimity instruction under *State v. Weaver*, *id*. at 36-38;

Claim 4: Ineffective Assistance of Trial Counsel for failing to introduce evidence bearing on the girls' motive to fabricate the sexual abuse allegation, *id*. 17 at 38-40;

Claim 5: Ineffective Assistance of Trial Counsel for failure to properly address the legal relationship of Molder to Savannah and Brittany, *id*. 17 at 40-43; and

Claim 6: Cumulative impact of trial counsel's deficiencies prejudiced Molder's defense and requires reversal, *id*. at 43-44.

## IV. Analysis

All the claims in Molder's federal petition allege that Hudspeth provided ineffective assistance of counsel. These claims are generally governed by the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, Molder must establish (1) counsel's representation fell below an objective standard of reasonableness, *Strickland*, 466 U.S. at 688, and (2) a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Id*. at 694.

The Montana Supreme Court adopted the reasoning of the postconviction

court in affirming the denial of relief for Molder. This court will "look through" the Montana Supreme Court's relatively unexplained summary denial and evaluate the state trial court's reasoned decision to determine whether the state court decision was "contrary to" or an "unreasonable application of" clearly established federal law as required by § 2254(d). *Brumfield v. Cain*, __ U.S. ___, 135 S. Ct. 2269, 2276 (2015); *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991).

## A. 28 U.S.C. § 2254(d)

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Under Section 2254(d), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See also*, *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§

2254(d)(1) and (d)(2).").

A state court decision is "contrary" to clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that is materially indistinguishable from a decision' " of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 15 405-406).

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Williams*, 529 U.S. at 413. However, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). The standard is "difficult to meet," and a "petitioner carries the burden of proof." *Cullen v. Pinholster*,  563 U.S. 170, 182 (2011) (internal quotation

marks omitted). "Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult. The standards created by *Strickland* and §2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted).

For the reasons explained below, Molder's claims should be denied. Molder has failed to establish that the state court's merits decision created a result that was contrary to clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of *Strickland*. Thus, this Court must afford deference to the decision of the state court.

### i. Claim One: Trial counsel's failure introduce the Miles City records

In adopting the rationale of the trial court, the Montana Supreme Court observed that Hudspeth was not ineffective for electing not to introduce these medical records. *Molder*, 311 P.3d at ¶¶ 7, 11. The trial court observed that Molder could not meet either prong of the *Strickland* test. That is, the court found that the manner in which Hudspeth used the records was objectively reasonable and resulted from a deliberate trial strategy. (Doc. 23-54 at 20.) Moreover, the court noted that even if Molder were able to meet the first prong of *Strickland*, he could not establish prejudice under the second prong. *Id*. at 21-22.

In his Amended Petition, Molder argues that there is no evidence to conclude that trial counsel's decision to forego introduction of the records was a strategic one, particularly because trial counsel was only provided with the records the night before trial. (Doc. 17 at 33.) This Court disagrees.

Prior to trial, there was a lengthy hearing before Judge Macek wherein Molder was allowed to air the grievances he had with counsel and discuss various trial concerns with the court. The night before trial, along with the Miles City medical records, Molder also provided trial counsel with a letter from Shauna written some years earlier, in which she denied having sexual intercourse with Molder. (Doc. 23- 22 at 5.) Trial counsel copied this letter and disclosed it to the prosecution. Notably, counsel did not elect to do the same with the Miles City medical records. The medical records were neither disclosed nor discussed with the court at the pretrial hearing. *See* (Doc. 23-22 at 5, 27). Near the conclusion of the hearing, based on Molder's concerns, the court asked Hudspeth if he needed additional time to prepare. Hudspeth informed the court that he was prepared to proceed to trial and no additional time was needed. *Id*. at 40-41. The record reveals the court would have been willing to provide Hudspeth with additional time to prepare for trial if needed. If he believed that this information warranted additional interviews and preparation, he certainly could have asked for it. Instead, Hudspeth chose a different strategy. It is not necessary to guess at this strategy

because Hudspeth explained it in his closing argument:

> Let's talk about the dates. You know that there was testimony about an exam in October of '99. Savannah talked about it. Brittany couldn't remember, but you know that there was something going on there. And you don't have to have direct evidence because I don't have to bring you the actual medical reports. They're in the government's possession. Somebody in DFS had them and didn't turn them over to Dr. Gerrity or Dr. Maynard, and apparently this county attorney's office knew nothing about it until this trial either.

> I had to bring it up, and that's a pretty important thing not for them to know about their own case. And you look at the dates. They have charged these cases back to February of '99 on several counts. Well, now, we know that if there was any evidence of intercourse on Brittany and Savannah, it would have shown up in October of '99. . . .

> If there would have been something wrong, do you really thing the government would have allowed Brittany and Savannah to be back with Kirk Molder in April of 2000? That tells you right there that there's a lack of—or there's something going on there, as to whether there was intercourse before April of 2000. And so the problem is the county attorney's office didn't know about it, about some sort of exam in October of '99.

> They charge it back to February of '98. And you know what? That just—that just screws the whole counts there, the whole case, because if you're going to charge it back there, and yet there's evidence that indicates there was no intercourse until after April of 2000, you charge this entire one-year period, and you go from February 10 of '98 to February 10 of '99, I mean, there's something wrong with that charge. And they're the ones that charged it, and that's their problem.

> And you know what I did, ladies and gentlemen? It's one of the—one of the only—one of the things that we can do when we represent people charged with crimes in this country. It's called waiting in the weeds, that's what I did. If they didn't know about it, that's their problem, but I asked the witnesses questions about it, and it came in, and now they realize that maybe they charged their cases wrong

because of that very fact, that that charge itself with the dates, there's
something wrong with that, because it was brought out in this trial.

(Doc. 23-24 at 149-52.)

The record reveals that Hudspeth's decision to withhold the medical records
was, in fact, strategic.  It does not matter that he only had one day to consider their
introduction; his decision was for tactical reasons.  As observed by the trial court,
had the records been introduced and the medical professionals called to testify, it is
highly likely they would have testified that there were no physical findings of
abuse.  Hudspeth was able to elicit this inference, that there must have been no
finding of abuse because the children were returned to Molder's care, through
cross examination.  He also stressed this point during closing argument.

The danger of Dr. Pezzarossi testifying was that she would have also
explained that the basis for the referral of both girls was suspected sexual
molestation and might have discussed the disclosures made prior to and during the
examinations of each girl.  Particularly, there was a danger that Savannah's
concerns, expressed to the doctor, would be disclosed to the jury.  Of particular
concern was Savannah's statement that she did not want any written record made
of Pezzarossi's examination, for fear Molder would find out what she had said.
(Doc. 23-52 at 25.)  Additionally, Savannah refused to allow Pezzarossi to
complete the genital examination.  Due to this fact and the disclosures Savannah
made to Pezzarossi, the doctor "strongly" recommended a follow-up examination,

26

which was subsequently performed while Savannah was under anesthesia. *Id*. Pezarossi also opined that "Savannah needs quite a bit of counseling." *Id*. For whatever reason, the State was unaware of this report before trial. Hudspeth's decision to keep things that way was tactical. Molder has failed to establish that the route chosen by Hudspeth was unreasonable. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

The state court's finding that Molder failed to establish deficient performance by trial counsel under *Strickland* in relation to the medical records was reasonable and should be afforded deference. Moreover, even if the records had been admitted, Molder has not established a reasonable probability of a different outcome. As the trial court noted, when Dr. Gerrity was asked if she had information that both of the girls' hymens had been intact in 2000, she said such information would not have altered her ultimate findings or conclusions. (Doc. 23-54 at 19.) Thus, Molder has failed to meet his burden under either prong of *Strickland*.

**ii. Trial counsel's failure to introduce Savannah's statement regarding prior sexual partners**

To the extent that Molder now attempts to bootstrap two constitutional arguments, specifically that the application of Montana's rape shield statute resulted in a violation of due process under the Fourteenth Amendment and a Sixth

Amendment Confrontation Clause violation, to his ineffective assistance of trial counsel claim, the claims must fail. Those constitutional claims were never presented to the state courts and are, therefore, procedurally defaulted. Molder has not presented cause and prejudice to excuse the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Nor, as discussed below, has he established a substantial claim of ineffective assistance of counsel, thus, the exception outlined in *Martinez* and its progeny is not available to excuse the default. *Martinez v. Ryan*, 566 U.S. ___, 132 S. Ct. 1309, 1320 (2012); *Trevino v. Thaler*, __ U.S. __, 133 S. Ct. 1911, 1918 (2013).

The trial court found, and the Montana Supreme Court agreed, that the proffered evidence did not fall within the noted exceptions to Montana's rape shield statute and was therefore inadmissible. (Doc. 23-54 at 27; Doc. 23-59 at ¶ 8.) The trial court further observed that it was not unreasonable, given the state of Montana law, for Hudspeth to conclude that the proffered evidence was inadmissible and therefore elect not to seek its admission. (Doc. 23-54 at 27-28.) The fact that Molder and Hudspeth had discussed the admissibility of this evidence was revealed at the pretrial conference:

> So he's got some real good defenses here and I–my opinion is, is that these girls, in fact, when they made their statements, they said they had intercourse with guys before they had intercourse with Mr. Molder. They weren't virgins. But that doesn't make any difference. Under the rape shield statute I can't get into that. I've told him that.

He disagrees with that. And I say, well, I disagree with it, too, but that's the law, can't get around that.

(Doc. 23-22 at 26.) In its order denying postconviction relief, the trial court cited five Montana Supreme Court cases that supported Hudspeth's interpretation of the application of the rape shield statute. (Doc. 23-54 at 26-27.)

Although the exact statement made by Savannah about previous sexual partners was not introduced into the postconviction record, the trial court observed that given the nature of the investigation and the manner in which the disclosure was made, there was reason to question the veracity of the statement. That is, it could be understood as her continued attempt to cover for Molder. *Id*. at 27. Savannah had initially denied any abuse, despite Dr. Gerrity observing injuries in 2001. In February 2003, Savannah continued to deny that any sexual abuse had occurred in Great Falls but acknowledged that sexual contact had occurred while she and Molder were in Canada. (Doc. 23-12 at 4.) It was during this interview that Savannah apparently made the non-specific response to questioning by Detective Shaffer that she had had sex with a boy in Miles City and one in Great Falls. It wasn't until one year later that she disclosed ongoing sexual abuse had occurred while she resided with Molder in Great Falls. *Id*. Savannah explained during trial her reasons for disclosing the abuse in a piecemeal manner. She explained initially she chose not to expose the abuse because she loved her dad and also liked having the freedom to do whatever she wanted. (Doc. 23-23 at 256-57.)

29

Savannah admitted to not making a full disclosure to Detective Schaffer initially, but said she fully disclosed one year later because she knew what Molder had done was wrong and it was wreaking emotional havoc on her. *Id*. at 262. In short, there is reason to question the veracity of Savannah's prior statement regarding unspecified prior sexual partners.

Additionally, as the State points out in its brief, prior to trial Molder wanted defense counsel to pursue a different strategy; that is, Molder did not believe the girls were sexually active. (Doc. 23-22 at 29.) Molder sought to obtain an expert to challenge the findings made by Dr. Gerrity and subsequently Dr. Maynard that Savannah and Brittany had trauma to their hymens consistent with sexual abuse. Apparently, Molder's first attorney attempted to do just that and sought a pediatrician to review the medical findings that had been made. (Doc. 23-7 at 3.) From the record, it seems the pediatrician made findings with which Molder disagreed. The defense was unable to secure an expert witness to refute the medical findings. (Doc. 23-22 at 13-14; 22-23; 25-26.) Hudspeth also explained to the Court that Molder wanted him to pursue a line of questioning with which Hudspeth disagreed, specifically whether Brittany and Savannah's hymens had been perforated at all. *Id*. at 27-28.

Had this testimony been offered, it would not have served to exculpate Molder. In fact, it would have been consistent with Dr. Gerrity's testimony and

opinion.  She opined that both Brittany and Savannah had suffered penetrating trauma to the hymen, consistent with sexual abuse, *see, e.g.*, (Doc. 23-22 at 317-18; doc. 23-23 at 55), she could not say who was responsible for the abuse, when the injury happened, or how many times the abuse occurred.  (Doc. 23-22 at 321; 323; Doc. 23-23 at 14; 41; 45; 51).

Even setting the proffered evidence aside, there was ample evidence before the jury, apart from Savannah's own testimony, that would point to the fact that Molder did, in fact, have sex with Savannah, Brittany, and Shauna.  As noted above, there were the physical findings by both Dr. Gerrity and Dr. Maynard that were consistent with sexual abuse of both Savannah and Brittany.  Brittany testified about her decision to make her disclosure of abuse after she was placed in the group home (Doc. 23-23 at 187-89; 196.)  Brittany also detailed the manner and pattern of abuse she experienced (Doc. 23-23 at 143-162) and the way in which the relationship between her and Molder changed once Molder's interest shifted to Savannah.  (Doc. 23-23 at 164-169.)  Brittany also disclosed seeing Molder sleep in the same bed as Shauna and said she saw them together under the covers.  *Id*. at 172-74; 218.

Additionally, there was the testimony from Shauna outlining the sexual relationship between her and Molder that began in April 1999 when she was fourteen years old.  Shauna described the manner in which their sexual relationship

began (Doc. 23-23 at 306-13), Molder's statement that she could not tell anyone about their relationship because he would "go to prison for a long time," *id*. at 312, the ongoing nature of their sexual relationship while Molder lived in Great Falls, *id*. at 315-16, that the relationship resumed when Molder moved back to Great Falls after living in Forsyth, *id*. at 319-20, the tapering off of the relationship because Molder was afraid the Department of Family Services would find out about it, *id*. at 319, her view of how Molder treated when she first knew the family (which would have corresponded to the time Molder was sexually abusing Brittany), *see* (Doc. 23-23 at 304), and then describing Molder's attention and special treatment shifting to Savannah (*id*. at 321-22) (which corresponded in time to shortly before the Molder children were removed by DFS in Great Falls and hwen the abuse of Savannah was occurring).  Shauna also testified that following a fight with Molder, and accompanied by her mother, she made a report to law enforcement regarding her sexual relationship with Molder; however, charges were never filed against him.   She explained that after she and Molder had reconciled, she wrote a letter at Molder's request recanting her allegation.  *Id*. at 324-29.

The finding that Molder failed to establish deficient performance in relation to counsel's failure to attempt to admit the evidence at issue was reasonable and should be afforded deference under § 2254(d).  Moreover, even assuming for the sake of argument that this performance was deficient, Molder has not established

the requisite prejudice under *Strickland*.  There was ample evidence before the jury

from which it could determine that Molder engaged in a pattern of activity

consistent with having a sexual relationship with Savannah and the other two

young women.  Molder has failed to meet his burden under either prong of

*Strickland*.

### iii.     Trial counsel's failure to request unanimity instruction

Likewise, Molder's claim of ineffective assistance of trial counsel for failure

to request a unanimity instruction must also fail.  The state court's decision that

Hudspeth's decision not to request such instruction and appellate counsel's

decision not to raise a corresponding claim on direct appeal did not constitute

deficient performance is reasonable.

In Molder's case, the court instructed the jury with a general unanimity

instruction.  (Doc. 23-52 at 136.)  Defense counsel did not request a special

instruction, nor was one given by the court sua sponte.  As the trial court observed,

unlike the allegations lodged in *Weaver*, each count contained in the information

referred to one victim and the verdict form corresponded to each victim and

included the appropriate time frame and specific offense alleged to have occurred,

specifically penile-vaginal penetration.  (Doc. 23-54 at 33.)  Although each girl

acknowledged in her testimony that the sexual relationship with Molder was

ongoing, each was able to testify with specificity regarding discrete incidents.

Moreover, there was an exception to *Weaver* in Molder's case.  In light of the continuous course of conduct that occurred and because the criminal acts against each girl were so closely connected, the trial court held the acts formed one transaction and, accordingly, one offense.  "Separate acts may also result in but one crime if they occur within a relatively short time span . . . ."  *State v. Weaver*, 964 P.2d 713, 720 (Mont. 1998).  Thus, the potential for jury confusion that was present in *Weaver* was not present here.  There is ample support in the record for this finding.

In relation to Shauna, there was only one count of sexual intercourse without consent charged (Count IX).  Although Shauna testified that the sexual relationship she had with Molder lasted for several years, Molder was only charged for one period of time, from April 1, 1999, to June 30, 1999.  This corresponded to the time period when Molder and the kids lived in Great Falls and first became acquainted with Shauna at the Highwood Motel, prior to their move to Forsyth, Montana.  Shauna testified that during this period the sexual relationship that she and Molder had lasted for approximately two months and that they had sex three to four times each week.  (Doc. 23-23 at 315.)

In relation to Savannah, there was one charge of sexual intercourse without consent (Count VII) and a corresponding charge of incest (Count VIII), both alleged to have occurred between June 1999 and June 13, 2001.  Although

Savannah could not state with specificity when the sexual relationship began, she was clear about when the last sexual encounter with Molder occurred—the night before the children were removed by the Department of Family Services on June 13, 2001. (Doc. 23-23 at 247-48; 255.)

Savannah estimated she had sex with Molder a minimum of five times but could not remember the exact number. *Id*. at 248. She was clear it happened more than once during the timeframe charged in Information. *Id*. at 260. By way of explanation, Savannah related the exact number of sexual encounters was difficult to recall because Molder would supply her with marijuana and alcohol before he had sex with her. *Id*. at 250.

Because Molder's abuse of Brittany spanned the longest period of time, during which the family moved regularly, the charges relative to her are a bit more challenging; however, there was still ample evidence before the jury correlating discrete acts of abuse to counts lodged against Molder. Brittany testified the first sexual contact happened when she was eight years old, in third grade at Lewis and Clark Elementary School while the family was living at the Highwood Village. (Doc. 23-23 at 134-35.) She explained that Molder penetrated her with his penis for the first time toward the end of the school year, in the spring, when she was eight years old. *Id*. at 141-42; 145-46; 227. This incident and timeframe correspond with Counts III and IV in the Amended Information. Brittany also

testified that Molder proceeded to have sex with her for a second time two days later. *Id*. at 214. This incident corresponds to Count V and VI in the amended information. From there, Brittany testified that Molder engaged in regular sexual activity with her for the next year or two. *Id*. at 215; 227.

The family then moved to Forsyth, and the children were temporarily removed from Molder's custody by the Department of Family Services. As set forth above, it was during this period of removal in the fall of 1999 that Brittany underwent the anal-genital exam in Miles City. Brittany testified that when the kids were placed back with Molder after the removal in Forsyth, Molder was living again at the Highwood Village. Although Brittany testified that the sexual abuse was ongoing, she recalled another specific time in the Highwood Village, when she was in fourth grade, during which Molder penetrated her. (Doc. 23-23 at 151-53.) Although this incident does not correspond to a count charged in the Information, it does underscore her testimony that the sexual abuse from Molder spanned multiple years.

Finally, Brittany testified to an encounter that occurred when she was eleven years old and the family was living at the Countryside Village trailer park in Great Falls. Brittany described the interior of the trailer and the sexual acts that took place. (Doc. 23-23 at 154-55; 157-58.) This incident corresponds to Counts I and II in the Amended Information.

The state court's finding that the manner in which the case was charged did not leave a possibility of jury confusion regarding Molder's acts is reasonable. Each count alleged in the information referred to one victim and the verdict form specifically set out the name of each victim, the time frame the act was alleged to have occurred, and the specific offense alleged in each count. Thus there was no potential for jury confusion as to which count pertained to which victim during a given time period. This is borne out by the trial testimony and the record before this Court.

To the extent that Molder claims the trial court's failure to give a specific unanimity instruction was incorrect under state law, this claim is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Furthermore, the state court's finding that Molder could not establish Hudspeth performed deficiently by electing not to request a unanimity instruction or that appellate counsel performed deficiently for failing to raise the unanimity instruction on appeal was not contrary to clearly established federal law. Furthermore, it did not involve an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). Thus, the claim lacks merit.

To the extent that Molder attempts to advance a due process claim, the state is correct that that claim is procedurally defaulted. Even setting this default issue aside and assuming Molder presents a cognizable federal claim, he would need to

show that the failure to instruct so infected the entire trial that the resulting conviction violated due process. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. 141 (1973). Molder has not met this "especially heavy" burden. *Henderson*, 431 U.S. at 155. Molder has not demonstrated a genuine possibility of juror confusion, nor has he shown that the nature of the evidence was particularly complex, that there was a discrepancy between the evidence and the information, or that some other factor was present that created the possibility for such confusion. *See, e.g., United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.), *cert. denied* 479 U.S. 844 (1986). Accordingly, this constitutional claim should also fail.

### iv. Trial counsel's failure to introduce evidence related to the girls' motive to fabricate allegations

A closer look at the factual circumstance around this claimed violation supports the trial court's finding that this allegation is "totally speculative" and "unsupported." (Doc. 23-54 at 28.) Molder faults trial counsel for not introducing evidence bearing on a supposed shared motive between Savannah, Brittany, and Shauna for fabricating the allegations they lodged against Molder. The "evidence" that Molder believes should have been pursued consists of a statement Kirk Molder, Jr., apparently made during the course of a counseling session to his therapist, Lisa Anderson, that was, in turn, related to a guardian ad litem and subsequently recorded in a report she made to the court in conjunction with the

38

Youth In Need of Care proceedings.

The report reads:

> ### Visit with Lisa Anderson, LCPC, Mountain Peaks, August 30, 2002
>
> Lisa Anderson met with [the guardian ad litem] and shared some
> information about Kirk Jr. Lisa said that Junior has been very
> responsive during their meetings. Lisa indicated that Junior said his
> grandmother had instructed him not talk about his father's business.
> Also, during their counseling sessions, Junior had mentioned that he
> had sex with Shauna. Junior sad that his sisters were directing him on
> how to . . . with Shauna. When Junior was asked to define sex, he
> explained that it is when a "guy puts his dick into the pussy."
> Moreover, Junior accused his sisters (Savannah and Brittany) of being
> lesbians. Once again, when Junior was asked to define the word
> lesbians, he said that it is when two girls are having sex and kissing.
> Moreover, Lizbeth was shown some of Junior's drawings. The house
> and the trees have phallic penis shapes. Other drawings of cartoon
> characters show very pronounced nipples.

(Doc. 23-52 at 90.) While the report indicates that the guardian ad litem spoke to

Junior's counselor on August 30, 2002, the report does not state when Junior made

this alleged disclosure. Moreover, this report was not filed with the court presiding

over Junior's Youth In Need of Care case until December 30, 2002. (Doc. 23-52 at

93.) Additionally, it does not appear that the treatment providers involved in

Junior's case were overly concerned with this purported disclosure. It was

recommended that all attempts be made to get Junior in a permanent placement

with Savannah and Brittany because "[h]e has a strong bond with them and does

not do well when separated from them." *Id*.

Savannah was placed in a residential treatment program in Helena, Montana,

on August 7, 2002.  In a report addressed to Detective Shaffer and dated September 30, 2002, there is an indication made that sometime prior to the writing of the report, Savannah began disclosing sexual abuse to her therapist in Helena. (Doc. 23-52.)  Brittany was placed in a residential treatment program in Dillon, Montana, on July 29, 2002.  Prior to the writing of the same report, it was noted that she also had begun disclosing sexual abuse by Molder.  *Id.*  Although Detective Shaffer testified that he began his criminal investigation in October 2002 following receipt of this report, due to scheduling difficulties he was unable to interview either Brittany or Savannah until February 2003.  (Doc. 23-23 at 112.) Given this timeframe, it is entirely possible that the girls made their initial disclosure of abuse prior to Junior making his statement to his therapist.

When Brittany was interviewed in February 2003, she fully disclosed and outlined the abuse she had suffered from Molder.  This was the only interview she gave to Detective Shaffer.  *Id.* at 92-93.  Savannah was interviewed initially by Detective Shaffer in February 2003, and she denied that sexual abuse occurred in Great Falls.  She was interviewed a second time in March 2004.  *Id.* at 99-101.  As set forth above, Savannah fully disclosed the extent of the sexual abuse during this second interview; she also testified at trial why she chose to disclose the abuse in this manner.

Shauna was not in contact with Savannah until the fall 2003.  (Doc. 23-24 at

29.)  After the two reconnected, Shauna spent two days over the Christmas holiday with Savannah.  *Id*.  By the time Shauna was back in contact with Savannah, Brittany had fully disclosed the abuse from Molder and Savannah had made a partial disclosure.  It was during Savannah's second interview in March 2004 that she provided Detective Shaffer with Shauna's name.

In short, Molder's timeline does not add up.  First, there is the distinct possibility that the Savannah and Brittany had disclosed sexual abuse to their treatment providers, although not to Detective Shaffer, prior to Junior's statement to his therapist.  Moreover, Junior, Savannah, and Brittany, were all living in different cities—Great Falls, Helena, and Dillon—when Junior gave his statement.  If Molder contends that the girls fabricated the allegations of abuse to draw attention away from Junior's disclosure, it is problematic to his argument that there is no indication that any of them were even aware of the disclosure.  Moreover, this disclosure was made in the context of a report to the court in a confidential and sealed proceeding to which neither Savannah nor Brittany was a party.  While it cannot be established with certainty that Brittany and Savannah began disclosing abuse to their therapists prior to Junior making the statement to his therapist, it is clear that the girls made their disclosures prior to Junior's statement being published to the court.  Additionally, if it is Molder's theory that the girls wished to draw attention away from their own wrongdoing, either their purported lesbianism

or alleged direction for Junior to have sex with Shauna at some unidentified time in the past, stating that they had engaged in sexual acts with their father was hardly the way to avoid unwanted attention.

There also was no reason at that point in time for them to go after Molder. They had been removed from Molder's care and placed in therapeutic group homes. Molder had been terminated from the Youth in Need of Care Proceedings, and he was incarcerated for committing custodial interference. In short, Molder was no longer a part of the girls' lives.

The trial court observed that this double hearsay statement from Junior[4] was inherently unreliable because there was no other information in the record to confirm that the alleged statement from Junior actually occurred. *Id*. at 25. The trial court also observed that there is no evidentiary support indicating that any of the three young women had knowledge of Junior's purported disclosure or indicating that they acknowledged making false allegations against Molder. In light of these observations, the court observed that Hudspeth's failure to seek to introduce this evidence did not deprive Molder of a confrontation right. *Id*. at 28. Further, the court found it objectively reasonable for Hudspeth to conclude that this proffered evidence did not fall within an exception to the rape shield statute and was, therefore, inadmissible. *Id*. at 28. Thus, Molder could not meet his burden of

---

[4] As pointed out by the State, this statement actually constitutes quadruple hearsay. (Doc. 26 at 37.)

showing that Hudspeth's performance was deficient. This rationale was adopted by the Montana Supreme Court. (Doc. 23-59 at ¶¶ 9, 11.)

This Court is not persuaded by Molder's reliance upon *Olden v. Kentucky*, 488 U.S. 227 (1988), and finds that case factually distinguishable from the present case. Additionally, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, *Strickland*. Hudspeth reasonably determined that the evidence at issue was inadmissible; thus, there was no reasonable basis for him to pursue impeachment based upon this multiple-level hearsay statement. Given the highly suspect nature of this purported evidence, it hardly presented a compelling ground for challenging each girl's motive to testify against Molder, particularly because there is no indication that any of them even knew of Junior's statement to his counselor.

Even if Hudspeth would have been able to have overcome the hurdle of Montana's rape shield law and successfully attempted to impeach or cross examine the girls with Junior's statement, given the nature and amount of testimony presented at trial against Molder, there is no reasonable probability that such impeachment would have altered the outcome of the trial. The state court decision should be afforded deference.

**v.      Trial counsel's failure to properly address the legal relationship between Molder and the girls**

As set forth above, prior to the initiation of criminal charges against Molder,

the girls were removed from his custody and Youth In Need of Care proceedings were initiated. Molder sought to be a party to the proceedings and held himself out to be the step-parent of the girls. Apparently, District Court Judge McKittrick initially found that a common law marriage was present and allowed Molder to stay involved. (Doc. 23-24 at 4.) Subsequently, it was determined Molder was not a birthparent, and he was removed from the proceedings.

The postconviction court ruled that the legal relationship required in a Youth In Need of Care proceeding is different from whether one has a legal relationship under the criminal statute of incest and dismissed the claim at the conclusion of the postconviction hearing. (Doc. 23-51 at 119-120.) The Montana Supreme Court agreed with the finding and held that Molder had failed to present a meritorious claim. *Molder*, 311 P.3d at ¶¶ 6, 11.

Molder argues that trial counsel was ineffective and the postconviction court erred when it found Hudspeth was not ineffective for conceding one of the elements of the four incest charges. Specifically, Molder argues that Judge McKittrick's order was the only "tangible evidence" available to undermine the state's case in relation to the incest charges and that by failing to introduce the order, Hudspeth lost the obvious avenue of attack. Molder goes on to argue that had this order come into evidence, "in all probability" he would have been spared the four incest convictions. According to Molder, the conclusion reached by the

state court to the contrary constitutes an unreasonable application of *Strickland*.

The record before this court belies Molder's argument. From the outset of the trial, it is apparent that Hudspeth was acutely aware of this common law marriage issue and sought to challenge whether the State could establish a legal relationship between Molder and Savannah and Brittany requisite to establish the elements of incest. At the pretrial hearing addressing Molder's concerns with counsel, Hudspeth advised the trial court that one of the principle defense strategies he intended to pursue was that the state could not prove incest because they could not establish the legal relationship. Hudspeth returned to this strategy several times during the pretrial hearing. (Doc. 23-22 at 26; 40-41.)

In pursuing this defense, Hudspeth attempted to elicit and did, in fact, elicit testimony to support his strategy. For example, Hudspeth elicited testimony from Lorri Clark, social worker involved in the Youth in Need of Care Proceedings, that after a series of hearing, it was determined that Molder was not the legal step-father of Brittany or Savannah. (Doc. 23-23 at 75-76.)

Far from conceding the issue of common law marriage, Hudspeth argued against the finding of such a marriage with various witnesses. He objected to the characterization of both girls as his "daughter" or "step daughter." (Doc. 23-22 at 254; Doc. 23-23 at 57.) After Brittany explained that Molder was the only father figure she had ever known (Doc. 23-23 at 119-121; 129), Hudspeth obtained an

admission from Brittany that although she referred to him as her stepdad, that was only because Molder and her mother had lived together for a while as a family unit. (Doc. 23-23 at 218-19.) Following similar testimony from Savannah that Molder was her step father and she believed her mother and Molder to be common law married, Hudspeth got Savannah to agree that Molder was never married to her mother. (Doc. 23-23 at 271.)

Molder contends that Hudspeth should have attempted to introduce Judge McKittrick's November 12, 2002 Order from the Youth In Need of Care proceedings into evidence. First, there is reason to believe that the trial court would not have done so, for fear that the jury could attach undue weight to the document and consequently circumvent their own findings. *See* (Doc. 23-24 at 15-16). Second, as pointed out by the State, the order also had potentially damaging information. In it, Molder is referred to as the "stepfather" of the girls. (Doc. 23-52 at 87.)

Additionally, Hudspeth did not enter into the stipulation at the beginning of the trial; it was only after the State informed the court of its intent to recall social worker Rachel Cotu to the stand that the possibility of the stipulation was raised. While Hudspeth agreed to the stipulation, he kept social worker Rachel Cotu from retaking the witness stand, and he successfully kept out testimony regarding Judge McKittrick's earlier legal conclusion that a common law marriage existed between

Molder and Berg. (Doc. 23-24 at 16-17.) The stipulation simply stated:

> At a hearing in a Youth in Need of Care case on July 25th, 2001, number one, the defendant asked the Court to allow him to appear. Number two, the defendant argued that he was common law married to Shannon Berg. And number three, the defendant asked for the right to participate in the proceedings regarding Savannah and Brittany Highland.

(Doc. 23-24 at 108.) Moreover, there had been testimony during trial that Molder had asserted the existence of a common law marriage early on in the family law matter. *See, e.g.*, (Doc. 23-22 at 261) (testimony from Rachel Cotu that shortly after the initiation of the removal proceedings, Molder told her that he had cared for the children since 1998 and he and Berg were common law married); *see also*, (Doc. 23-23 at 58) (Lori Clark testified, "[Molder] let me know that he was their father, stepfather, he was their primary caretaker. He was the only one that should be considered for placement of the children."). In reviewing what transpired during the hearing outside of the jury regarding the potential recall of Cotu and the ultimate language of the stipulation, the Court can glean the basis for Hudspeth's rationale. He proposed the stipulation so that Cotu would not be called back to the stand and potentially undermine the favorable testimony that was able to put before the jury. *See generally* (Doc. 23-24 at 4-17).

Ultimately, the issue of whether there was a common law marriage was a question for the jury to decide in relation to the incest counts. The trial court stated

it was not inclined to introduce the legal conclusion made by Judge McKittrick so there is reason to believe that even had Hudspeth attempted to introduce McKittrick's actual order, the court would not have allowed it.  Moreover, as set forth above, the order also contained problematic information for Molder.  Finally, at a prior hearing Molder had asserted a common law marriage, and the fact that he was the legal caretaker of Savannah and Brittany was already before the jury. Thus, Molder has not met his burden to establish that Hudspeth's performance in this realm was deficient. To the contrary, it was entirely reasonable for Hudspeth to agree to the stipulation that at some point in time Molder had attempted to argue that he was common law married, when there was testimony to undermine this assertion, instead of recalling Cotu and giving the state the opportunity to clarify exactly what had occurred in the context of the Youth In Need of Care proceedings.

During the closing argument, the common law marriage was the first issue Hudspeth addressed in the context of analyzing the State's burden of proof.  (Doc. 23-24 at 132-134.)  Hudspeth addressed the issue again, arguing the state had not proved any element of common law marriage and absent this proof, incest could not be established.  *Id*. at 139-43.  Far from conceding the issue or failing to address it, Hudspeth fought to keep Cotu off the stand and persisted in pursuing his defense relative to the common law marriage issue.  Because Molder has not met

his burden, the state court decision should be afforded deference.

### vi.    Cumulative Error

Because Molder is unable to establish a single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). The state court decision in this regard should be afforded deference.

### B. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules governing § 2254 Proceedings. A certificate of appealability should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Molder has not made a substantial showing that he was deprived of a constitutional right. There are no close questions, and there is no reason to encourage further proceedings. A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATIONS

1. Mr. Molder's petition should be DENIED and DISMISSED WITH PREJUDICE; his claims are without merit.

2. The Clerk of Court should be directed to enter, by separate document, a judgment of dismissal.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Molder may object to this Findings and Recommendation within 14 days.[5] 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Molder must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this action without notice to him.

DATED this 18th day of August, 2016.

   /s/ John Johnston
John Johnston
United States Magistrate Judge

---

[5] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.